IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 99-50992
(Summary Calendar)
_____

JAMES P. CASIANO,

Plaintiff-Appellant

versus

AT&T CORPORATION; ET AL,

Defendants

AT&T CORPORATION

Defendant-Appellee.

--------------------
Appeal from the United States District Court
for the Western District of Texas
--------------------
June 12, 2000

Before POLITZ, WIENER, and DENNIS, Circuit Judges.

WIENER, Circuit Judge.

In this supervisor sexual harassment case under Title VII,[1] Plaintiff-Appellant James P. Casiano appeals the district court's grant of Defendant-Appellee AT&T's motion for summary judgment dismissing Casiano's claims asserted on grounds of quid pro quo harassment and retaliation. For reasons differing but slightly from those expressed by the district court, we affirm, writing separately only to clarify a few nuances that apparently continue

---

[1] 32 U.S.C. § 2000 <u>et</u> <u>seq.</u>

to confound some litigants and trial courts in cases such as this.

I.

FACTS AND PROCEEDINGS

AT&T initially hired Casiano in 1990 as a Customer Representative. He worked in AT&T's Personal Account Service Department (PAS) between October, 1995 and March, 1997 except for a medical leave hiatus between June and November, 1996. Casiano was granted a temporary position as a Training Assistant in AT&T's Education Department in March, 1997 but remained attached to PAS, under the supervision of Kathleen Stiggers. From April until October, 1997, Casiano was mentored and observed by Anna Rodriguez, a Course Administrator in the Education Department. During that mentorship, Rodriguez noted that Casiano's files and paperwork were not properly handled, that his procedure book for a Refresher Disability Training course had not been maintained correctly, and that he had not adequately maintained his PAS portfolio of customers whom he had agreed to continue servicing while assigned temporarily to the Education Department. These deficiencies were documented by Rodriguez, and she counseled Casiano on the need for improvement in these areas.

In October, 1997, when Casiano's training to teach AT&T Worldnet commenced, his instructor, Kathy Aguilar, became his mentor. According to Casiano, it was during this period that he directly requested another Course Administrator, co-defendant Susie

2

Valenzuela, to stop asking him to bring her personal items such as drinks and food. Casiano states that this request was ineffective so, on December 17, 1997, he complained to Elsa Neaves, the Training Staff Manager of the Education Department, about Valenzuela's behavior. In that initial complaint, he did not mention or imply any sexual connotations but did describe the retrieving of personal items as demeaning. He referred to them as orders or commands rather than requests and stated that they were made in the presence of other supervisory co-workers. (After filing suit, Casiano averred additionally that on occasion Valenzuela referred to him as "honey" or "my honey," made a statement to his wife about his having to work late with Valenzuela, and phoned him at home late in the evening, ostensibly on work related matters.)

Casiano was advised by Neaves that she would speak to Valenzuela regarding these actions. Neaves apologized to Casiano for Valenzuela's behavior and told Casiano to let her know if Valenzuela's actions persisted. Neaves spoke to Valenzuela that same day, advising her that the behavior complained of was unprofessional and had to stop.

Casiano did not complain further to Neaves, but two days later, on December 19, 1997, he and Paul Amerson, union steward for Communication Workers of America, spoke "off the record" with Lee Barden of AT&T's Corporate Security regarding the same actions about which Casiano had complained to Neaves, albeit without

3

identifying the offending supervisor by name. The stated reason for conducting the meeting off the record was to ensure that there would be no notes, files, or documents reflecting that the meeting had occurred or that Casiano had complained to Barden that a manager was acting inappropriately. Barden advised Casiano to report his allegations to the AT&T Equal Opportunity Department, but the record does not reflect that he did so. None dispute that neither Casiano nor Amerson identified Valenzuela or alleged that the unidentified supervisor had repeatedly initiated discussions of marital status and sexual experiences and had requested to have sex with Casiano.

That same month, Casiano completed his course of instruction on Worldnet and returned to his full-time position as a Customer Representative. In his deposition, Casiano insisted that he was "removed" as a Training Assistant and "sent" back to work as a Customer Representative after complaining to Neaves. He also alleged that he lost his "pay differential," and that Valenzuela indirectly threatened retaliation, stating pointedly in his presence that, when she is crossed, she responds ten times as severely.

In January of 1998, Casiano sought to participate in Associate-to-Management Assessment of Process (AMAP), submitting an application packet to Pete Ramirez, his supervisor at the time. As Casiano had not received a personal appraisal within the previous twelve months, a requirement to participate in AMAP, Ramirez

4

contacted Aguilar and requested such an appraisal of Casiano. She prepared one covering April through December, 1997, the period of Casiano's assignment to the Education Department. In completing the appraisal, Aguilar consulted several other Course Administrators, including Rodriguez, regarding Casiano's performance. When the appraisal was complete, Aguilar reviewed it with Casiano and advised him that he was receiving a rating of "satisfactory," too low for him to be eligible for the AMAP program. Claiming he was not thus informed, Casiano reported to take a prerequisite GMAB test but was removed by a supervisor because Casiano's "satisfactory" personal appraisal made him ineligible to participate.

In February 1998, AT&T received a letter from Casiano's lawyer alleging sexual harassment by Valenzuela, mentioning specifically her requests that Casiano "retrieve" personal items for her and have sex with her. Casiano has sworn that Valenzuela not only demanded that he bring her food, beverages, and her purse (from three floors away) and referred to him in the presence of other workers as "honey" and "James, my honey," but that on at least fifteen occasions during a four-month period, she had initiated sexual conversations and requested that he engage in sex with her.

Valenzuela was removed from work forthwith by AT&T's Equal Opportunity ("E.O.") Department pending an immediate investigation of Casiano's complaint. E.O. Specialists Robert Everett and Karol Burnett-Quick from AT&T's E.O. Department in San Francisco traveled

5

to San Antonio to conduct the inquiry, interviewing eleven persons, including both Casiano and Valenzuela. None of these co-workers could substantiate Casiano's allegations that Valenzuela had asked him for sex, and the investigation reflected that among co-workers in the area where Casiano and Valenzuela worked requests for "retrieval" of items such as coffee, snacks, and soft drinks were commonplace. Not surprisingly, there were no third-party witnesses to Valenzuela's alleged propositioning of Casiano, only his accusations and her denials. Everett and Burnett-Quick also concluded that there were no sexual implications in the beverage requests or use of the term "honey."

On the basis of that investigation, AT&T concluded that there was insufficient evidence to support Casiano's allegations of sexual harassment. The investigation did reveal, however, that Casiano's personal appraisal should have been conducted by Stiggers, his supervisor preceding his time in the Education Department, and should have covered the twelve-month period between December, 1996 and December, 1997; and that Aguilar's written input as a Course Administrator should have been limited to Casiano's performance in the Education Department. Consequently, the appraisal prepared by Aguilar was discarded and a new one was prepared by Stiggers. In it too, Casiano received a rating of "satisfactory" for 1997. He has not contested the second appraisal as being retaliatory, yet it appears to be the one that resulted in his being denied participation in the AMAP program.

6

Casiano sued both AT&T and Valenzuela (in her individual capacity), claiming discrimination in violation of Title VII. He alleged both quid pro quo sexual harassment and retaliation — the latter tied to the initial "satisfactory" evaluation — for complaining about Valenzuela's behavior toward him. Several months after being sued, Valenzuela filed a motion for summary judgment seeking dismissal on grounds that she was not an "employer" for purposes of Title VII and thus could not be held individually liable to Casiano. The district court dismissed Casiano's action against Valenzuela, and Casiano has not appealed that ruling.

Subsequently, AT&T moved for summary judgment. It asserted six grounds for dismissing Casiano's action: (1) Casiano could not establish a prima facie case of actionable sexual harassment under Title VII; (2) Casiano could not establish that he suffered a tangible employment action or that such an action was taken against him as a result of any alleged sexual harassment; (3) AT&T had exercised reasonable care to prevent and correct promptly any alleged sexually harassing behavior by Casiano's supervisor; (4) Casiano unreasonably failed to take advantage of any preventative or corrective opportunities provided by AT&T; (5) Casiano could not present evidence that he engaged in a protected activity sufficient to afford protection of the anti-retaliation provisions of Title VII; and (6) Casiano could not present evidence that he suffered an adverse employment action as a result of engaging in any protected activity.

7

In September of 1999, the district court granted AT&T's motion for summary judgment, dismissing Casiano's claims with prejudice. After an abbreviated review of some of the "Undisputed Material Facts" and a reiteration of some of the elements necessary for an employee to recover for "quid pro quo" sexual harassment, including suffering "some type of tangible injury, or loss of a tangible benefit, because he refused his supervisor's advances," the district court emphasized AT&T's internal employee grievance procedure of which Casiano availed himself and AT&T's actions in response to Casiano's complaints. The court also discussed the content of Casiano's initial complaint (which did not include allegations of sexual comments) to AT&T about Valenzuela's alleged actions, the initial "satisfactory" evaluation by Aguilar, Casiano's failure to make or imply sexual complaints until his attorney's letter in February, and his failure ever to complain about the Stiggers' "satisfactory" evaluation after the Aguilar evaluation was withdrawn and replaced. Rejecting the quid pro quo claim, the court concluded that Casiano would not be able to prove that any tangible employment action against him had a causal connection with his refusal to comply with Valenzuela's alleged sexual demands or his complaints to AT&T personnel about Valenzuela's behavior when she called him "honey" or when she requested or demanded that he bring her coffee, cold drinks, and her purse. Also rejecting the retaliation claim, the court concluded that, as a matter of law, Casiano could not show the

8

required nexus between the denial of access to AMAP and the "satisfactory" evaluation that barred him from participation in that program, as the evaluation allegedly made in retaliation for his complaints about Valenzuela was withdrawn and replaced with a new one that also classified him as "satisfactory" but about which he did not complain. Casiano timely filed his notice of appeal.

## II.

## ANALYSIS

We review the district court's grant of summary judgment under the well-known de novo standard. We can and frequently do affirm the judgment of a district court for reasons other than those expressed by that court. Such is the situation here, but only in minor part. Moreover, we do so to reinforce the methodology specified by the Supreme Court for disposing of all supervisor sexual harassment cases under Title VII,[2] following step by step the clear road map laid out for trial and appellate courts in companion cases, Burlington Industries, Inc. v. Ellerth[3] and Faragher v. City of Boca Raton.[4] And, lest our verbal exposition of the methodology mandated by the Supreme Court in those two cases

---

[2] See Indest v. Freeman Decorating, Inc., 168 F.3d 795 (5th Cir. 1999)(Wiener, J., specially concurring). Compare, id. at 164 F.3d 258 (Jones, J.)(neither opinion precedential for lack of concurrences). There are distinguishing differences in the acts of the employees and employers in Indest and the instant case.

[3] 524 U.S. 742 (1998).

[4] 524 U.S. 775 (1998).

9

be less than pellucid, we append to this opinion a graphic representation of that procedure.[5]

At the first stop on the Ellerth/Faragher road map, courts are required to determine whether the complaining employee has or has not suffered a "tangible employment action."[6] If he has, his suit is classified as a "quid pro quo" case; if he has not, his suit is classified as a "hostile environment" case. That determination provides a fork in the road on the Ellerth/Faragher map: In a "quid pro quo" case, the road branches toward a second stop at which the court must determine whether the tangible employment action suffered by the employee resulted from his acceptance or rejection of his supervisor's alleged sexual harassment.[7] If the employee cannot show such a nexus, then his employer is not

---

[5] See Supervisor Sexual Harassment Road Map, appended hereto and made part hereof. We do not mean to imply that trial courts must pause at each stop on the route and rotely verbalize its significance or insignificance to the particular case; stops can be skipped if the implications are obvious or can be assumed arguendo so as to reach a subsequent stop at which the case ultimately turns. For example, without stopping a court that has found the existence of a "tangible employment action" could assume arguendo that the plaintiff has been sexually harassed by a supervisor, then go directly to Stop 2 on the quid pro quo branch and determine at that stop that there is no evidence (or no genuine issue of material fact) of a nexus between the harassment and the employment action.

[6] See Ellerth, 524 U.S. at 761-62 (tangible employment actions "require[] an official act of the enterprise, a company act," such as "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits")

[7] Id. at 753-54.

10

vicariously liable under Title VII for sexual harassment by a supervisor; but if the employee can demonstrate such a nexus, the employer is vicariously liable per se[8] and is not entitled to assert the one and only affirmative defense permitted in such cases since Ellerth and Faragher.[9]  In other words, proof that a tangible employment action did result from the employee's acceptance or rejection of sexual harassment by his supervisor makes the employer vicariously liable, ipso facto; no affirmative defense will be heard.

On the other hand, if the first-stop question is answered in the negative, i.e., the employee did not suffer a tangible employment action —— the situation perceived to exist as a matter of law by the district court in this case —— the suit is a "hostile environment" case, and the other branch at the fork in the Ellerth/Faragher road must be followed.  On this branch, a different inquiry ensues at the second stop:  If proved, would the actions ascribed to the supervisor by the employee constitute severe or pervasive sexual harassment?[10]  If they do not, Title VII imposes no vicarious liability on the employer; but if they do, the

---

[8]Id. at 753, 761, 762 ("[A] tangible employment action taken by the supervisor becomes for Title VII purposes the act of the employer."); Faragher, 524 U.S. at 804-05.

[9]Ellerth, 524 U.S. at 765; Faragher, 524 U.S. at 808.

[10]Ellerth, 524 U.S. at 752, 754; Faragher, 524 U.S. at 787-88 (citing Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993)).

11

employer is vicariously liable —— <u>unless</u> the employer can prove both prongs of the <u>Ellerth/Faragher</u> affirmative defense, to wit: Absent a tangible employment action, (1) the employer exercised reasonable care to prevent or correct promptly any such sexual harassment, and (2) the employee did not unreasonably fail to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise.[11]  As noted, this is the employer's only affirmative defense in a supervisor sexual harassment case post <u>Ellerth/Faragher</u>, and it is available only in a hostile environment (<u>no</u> tangible employment action) situation; never in a quid pro quo (tangible employment action) case.

As the affirmative defense is applicable only when the asserted sexual harassment by a supervisor has <u>not</u> produced a tangible employment action, the court cannot merely assume <u>arguendo</u> the presence of actionable harassment with a nexus to a tangible employment action and decide the case on the affirmative defense —— it is simply not available.  Determination whether the complaining employee has suffered a tangible employment action is the indispensable first step in every supervisor sexual harassment/vicarious liability case under Title VII, even if subsequent stops on the road map may be skipped.[12]

---

[11]<u>Ellerth</u>, 524 U.S. at 765; <u>Faragher</u>, 524 U.S. at 805, 807.

[12]  <u>See</u> <u>supra</u> n.5.

12

We agree with the district court that, on the basis of Casiano's summary judgment evidence, he cannot prove that he suffered a tangible employment action; he cannot demonstrate the existence of a genuine dispute of material fact in that regard. Even when we view the facts in the light most favorable to Casiano as the non-movant, we perceive nothing in his evidence or the inferences from it supporting a conclusion that his ineligibility to take the GMAB test or otherwise participate in the AMAP program constituted a tangible employment action by AT&T. While serving as a Training Assistant in the Education Department, Casiano remained permanently assigned to the PAS; he could only gain entry to AMAP by, inter alia, taking and passing the GMAB test, eligibility for which required a personal evaluation better than "satisfactory." Even assuming arguendo that his initial evaluation was somehow tainted by input from Valenzuela or was otherwise downgraded in retaliation for his having reported her alleged misbehavior, that evaluation is not the one that barred him from the test and the program. Rather, the second evaluation, performed by the appropriate supervisor for the appropriate twelve-month period —— which gave him the same "satisfactory" rating —— was the one that blocked him; and he did not (and likely could not) complain that the second evaluation was the product of retaliation.

Having determined the absence of a tangible employment action, which absence pretermits quid pro quo analysis, the hostile environment branch of the Ellerth/Faragher road map leads to our

next stop, at which we must determine whether Valenzuela's alleged misbehavior, if proved, was sufficiently "severe or pervasive" to create an actionable "hostile environment."

The district court gave relatively short shrift to the issue of severe or pervasive sexual harassment. Although, like that court, we eventually reach the final stop on this "hostile environment" branch of the Ellerth/Faragher road, i.e., the employer's affirmative defense, we are constrained to note that, for summary judgment purposes — again, treating Casiano's affidavit and deposition testimony as summary judgment evidence and viewing it, its inferences, and all other evidence in the light most favorable to him — Casiano has at least demonstrated the existence of a genuine issue of material fact whether the alleged sexual harassment rises to the severe or pervasive level. Standing alone, neither a supervisor's referring to a subordinate employee of the opposite sex as "honey" nor the supervisor's demanding — even in the presence of others — that the subordinate employee perform demeaning personal tasks for the supervisor, is sufficient to constitute sexual harassment.[13] When viewed in pari materia with multiple incidents of egregious sexual misconduct alleged, however, such behavior can serve to bolster a conclusion of sexual harassment, even severe or pervasive harassment.

_____

[13]But see Ellerth, 524 U.S. at 754 (expressing no opinion whether a "single unqualified threat is sufficient to constitute discrimination in the terms and conditions of employment").

14

Here, there is a classic, no-witness "swearing match" between Casiano and Valenzuela regarding overt sexual conduct: Despite Valenzuela's vehement denial, Casiano has sworn that, on at least fifteen separate occasions during a four-month period, she directly propositioned him to engage in sex and to discuss their respective sexual appetites and experiences. In the context of the demeaning or humiliating implications of requests or demands for the delivery of food, drinks, or a purse and references to a subordinate as "honey," such extensive and persistent sexual overtures would, if proved, almost certainly constitute severe or pervasive sexual harassment. In this evenly balanced, no-other-evidence, "he said/ she said" case, either party could prevail at trial, depending solely on which one the trier of fact believes after hearing the testimony and observing the demeanors of the protagonists on the witness stand.

The law is well settled that sexual harassment of an employee by a supervisor is not confined to instances involving male supervisors and female subordinates; it can occur in the female supervisor-male subordinate context. It can even occur in the same-sex context.[14] Indeed, we need only hypothetically transpose the sexes of the parties in this case to demonstrate our point: If Valenzuela had been male and Casiano female, summary judgment evidence supporting allegations that the male supervisor had (1)

---

[14] See Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75 (1998).

15

called the female subordinate "honey" in the presence of other employees; (2) repeatedly demanded that she bring him his coffee, cold drinks, snacks, and a personal item; (3) attempted, in the privacy of his office, to initiate discussions with her about their respective sexual proclivities, preferences, and performances; and (4) in a four-month period, propositioned her (and been rejected) to engage in extramarital sex with him no less than fifteen times, would any court conclude that —— if proved —— such behavior would not constitute severe or pervasive sexual harassment? As such evidence would present a stereotypical genuine issue of material fact, we are constrained to disagree with the district court's inference that Casiano did not demonstrate at least the existence of such a factual dispute about the presence of severe or pervasive sexual harassment. As we view the situation, he would be able to defeat summary judgment and thus be entitled to proceed to trial on his claim of AT&T's vicarious liability —— unless AT&T could sustain its affirmative defense.

Having faithfully followed the hostile environment branch of Ellerth/Faragher road after concluding, at the initial fork in that road, that Casiano failed to demonstrate a genuine dispute of material fact concerning a tangible employment action, and concluding, at the next stop, that he did establish the existence of such a dispute concerning severe or pervasive sexual harassment by a supervisor, we come now to the third and final stop on this

16

branch of the road.  Here, we must test the employer's one and only potential affirmative defense.

AT&T insists, first, that it exercised reasonable care to prevent and, if not prevented, to correct promptly any sexually harassing behavior by supervisory personnel, and, second, that Casiano unreasonably failed to take adequate and appropriate advantage of any preventative or corrective opportunities provided by AT&T or to avoid such harm otherwise. Like the district court, we agree with AT&T.

The summary judgment evidence adduced by AT&T regarding its extant procedures for encouraging and facilitating employee complaints of sexual harassment and for thereafter dealing with them swiftly and effectively is essentially uncontroverted and eschews the existence of a genuine dispute of material fact in that regard.  AT&T's Personnel Guide, Employee Reference Guide, and "Common Bond" all articulate the company policy that forbids sexual harassment and encourages both those who believe they are being harassed and those who witness harassment to notify supervisors as well as the "applicable" AT&T EO/AA representative.  Casiano concedes awareness of these publications and the policies they embody, and further acknowledges that supervisors reviewed them with him both initially and during the course of his employment. He acknowledges familiarity with the procedures for lodging complaints, yet the evidence shows that he did not effectively avail himself of those procedures.  Both his first complaint,

17

lodged with Neaves, and his "off the record" discussion with Barden and the union steward, were devoid of either direct or implied reports of sexual harassment. Casiano also failed to heed Barden's advice to report the situation and, moreover, the responses of Neaves and Barden to Casiano's complaints of supervisory misbehavior of a non-sexual nature were entirely appropriate, both temporally and substantively.

When, through his counsel, Casiano finally notified AT&T of alleged sexual misconduct, well after the harassment and well after Casiano had ceased working in the Education Department, AT&T responded promptly and effectively: It suspended Valenzuela, the accused harasser, and dispatched two of its E.O. Specialists to conduct an in-depth investigation involving, among other things, interviews with Casiano, Valenzuela, and nine other workers. The conclusions reached by the investigators are well-substantiated by the information they were able to ferret out, so the suggested action and the action actually taken by the employer on those recommendations were reasonable.

Considering the employee's efforts and assuming for summary judgment purposes that Casiano's allegations against Valenzuela are true, the only reasonable conclusion we can reach is that he unreasonably failed to take advantage of any preventative or corrective opportunities afforded him by AT&T or to avoid harm otherwise. By his own account, he suffered at least fifteen propositions yet never reported any of the incidents until months

18

after the last of them. In his earlier complaints, he never raised one specter of direct sexual overtures, even implicitly. He did nothing else, within or without the prescribed policy and procedures, until his lawyer wrote the company, well after the fact. We are satisfied that, were this case ever to go to trial, AT&T would be entitled to judgment as a matter of law on its Ellerth/Faragher affirmative defense, if nothing else.[15] Thus, no useful purpose would be served by reversing the district court's grant of AT&T's summary judgment and remanding the case for trial. Other than causing a significant waste of judicial resources at the trial and appellate levels and causing the parties to expend considerable financial resources in further litigation, nothing would be gained by postponing the inevitable. For the forgoing reasons, the district court's grant of summary judgment in favor of AT&T, dismissing Casiano's action, is, in all respects AFFIRMED.

---

[15]See Faragher, 524 U.S. at 807 (stressing that "[i]f the plaintiff unreasonably failed to avail herself of the employer's preventative or remedial apparatus, she should not recover damages").

19

# SUPERVISOR SEXUAL HARASSMENT ROADMAP*



* Courtesy of Honorable Tom Stagg, Senior United States District Judge (W.D. LA)