United States Court of Appeals
Fifth Circuit

**F I L E D**

**November 11, 2004**

Charles R. Fulbruge III
Clerk

REVISED DECEMBER 7, 2004
IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 04-60028
Summary Calendar

JANE S. THOMPSON,

Plaintiff - Appellant

versus

NAPHCARE, INC. AND RONALD D. ISAAC,

Defendants - Appellees

Appeal from the United States District Court
for the Southern District of Mississippi
(No. 1:02-CV-18-GRo)

Before JOLLY, WIENER, and PICKERING, Circuit Judges.

PER CURIAM:[*]

Plaintiff-Appellant Jane Thompson, a Registered Nurse ("RN"), appeals the district court's summary judgment dismissal of her Title VII claims against her former employer, Defendant-Appellee Naphcare, Inc. ("Naphcare"), a healthcare services provider. She also appeals the district court's grant of a motion filed by her former supervisor at Naphcare, Defendant-Appellee

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

Ronald D. Isaac, to dismiss for failure to state a claim under state law.[1]  We affirm.

## I. FACTS AND PROCEEDINGS

Plaintiff-Appellant Jane Thompson worked for Naphcare as an RN supervisor at the Harrison County Adult Detention facility in Gulfport, Mississippi, for a total of three months and two weeks, viz., from June 6 to September 21, 2000.  Isaac went to work at Naphcare about a month after Thompson, on July 3, 2000, in a supervisory role over Thompson.  She contends that Isaac immediately began a pattern of harassment, consisting of unwelcome sexual comments and touching.

Thompson specified five such incidents.  First, she testified in her deposition that on July 3, 2000, while Isaac was introducing himself to the staff, he asked her about her age, then commented that she "certainly didn't look" her age.  Thompson also stated that, while discussing with Isaac her forthcoming vacation to the Caribbean, he commented that she had a figure that most college girls would envy and that she should leave her husband behind and take Isaac along instead.  She further asserted that, without invitation, Isaac twice touched her in an intrusive manner, viz., rubbing her shoulders, once when she was standing in a doorway and again while she was sitting at a computer.  Finally, Thompson

[1] The district court also dismissed Thompson's state law claims against Naphcare and her Title VII claims against Isaac, but she has not appealed these rulings.

2

averred that Isaac informed her during a private conference in his office near the end of August that it was his responsibility to protect her from other personnel and that if she were "not so wrapped up with" her husband, she could see what Isaac would do for her.

Thompson also testified that, in late August and early September, Isaac's attitude toward her changed; that he began berating her in an unprofessional manner for negligible mistakes. She added that, on or about August 30, 2000, Isaac stated that Thompson was unprofessional and threatened to replace her unless she improved. She contends that, at this meeting, Isaac told Thompson that she, an RN supervisor, would thereafter be supervised by Geraldine Wells, a Licensed Practical Nurse ("LPN"). (Thompson concedes, however, that Isaac had appointed Wells as "clinic supervisor" on his first day in the office; and in his affidavit, Isaac averred that he expected Wells, who had experience working in correctional facilities, to provide coordination and guidance to other staff members, including RNs, on matters of security, clinic flow, documentation, and referral matters.) Thompson complained to Naphcare about this arrangement on September 13, 2000 and thereafter called the Mississippi State Board of Nursing to report the situation. (The Board did not contact Naphcare or investigate until after Thompson had resigned.)

Thompson also contended that, on September 1, 2000, Isaac reprimanded her for taking too much time on a visit to the Juvenile

3

Detention Facility, screaming at her and accusing her of "stealing company time." According to Thompson, Isaac followed up by issuing a written warning to her, which was later revised to remove Isaac's charge of "theft of company time." Thompson also stated that, on the same day, Isaac screamed at her for continuing to examine a patient after she had already clocked-out for the day. Isaac also contacted Naphcare human resources on September 4, 2000 to discuss extending Thompson's probationary period because of "performance issues." He discussed this extension in a private meeting with Thompson and another co-worker on September 6, 2000, but neither he nor Thompson produced testimony from the co-worker who allegedly witnessed this exchange. At this same meeting, Isaac gave Thompson a set of guidelines delineating areas in which she had to improve, including establishing priorities, completing paperwork, and training on specified equipment. Thompson said that Isaac called her "incompetent" during this meeting.

Thompson consulted an attorney on August 30, 2000 concerning Isaac's allegedly discriminatory behavior. Naphcare first received notice of Thompson's accusations on September 5, 2000, when Isaac's supervisor, Bob Malone, received a letter from Thompson's attorney. Two days later, Naphcare dispatched Ashley Clark, its director of human resources, and Vance Alexander, its in-house counsel, to the Harrison County worksite to investigate the charges that Thompson's lawyer had leveled. Clark and Alexander interviewed individuals identified by Thompson as witnesses to the alleged events but were

4

unable to substantiate the charges raised in the letter from her lawyer. In fact, the Naphcare employees who were interviewed by Clark and Alexander denied witnessing any inappropriate behavior on the part of Isaac. An employee who witnessed the conversation about Thompson's Caribbean vacation recalled that Isaac mentioned wanting to go on vacation, but did not find Isaac's comments to be inappropriate or offensive. LPN Wells was also present during some of the allegedly unseemly conversations: Wells denied witnessing anything inappropriate between Isaac and Thompson. The investigators also noted that the office was much like a "fishbowl," in that glass walls enclosed three walls of Isaac's office, and only a half wall separated the nurses' station from the main administrative area.

Despite the absence of verification of the charges against Isaac, the investigators instructed him not to communicate with Thompson without other employees being present. After Naphcare's investigators left, Isaac approached Thompson to apologize and to try to explain his position. Thompson found this action inappropriate and complained to Clark, who told Isaac's supervisor, Malone, to instruct Isaac not to discuss the matter further with Thompson.

On September 13, the day Isaac left on vacation and the day preceding her own final day of work at Naphcare, Thompson complained to Clark and Malone that her work had been too closely scrutinized by LPN Wells that day. Thompson also reported that

5

Isaac had telephoned the office that day and, after speaking with Wells, had accused Thompson of refusing to do her work.

Following the September 7 investigation, Thompson worked until September 14, took paid leave for health reasons September 18-20, and resigned on September 21. She thus worked a total of only seven days after the investigation. Other than Isaac's unwelcome apology and the September 13 phone conversation, Thompson did not claim to have had any contact with him from the time of Naphcare's September 7 investigation until her resignation on September 21. She did assert that it was at Isaac's direction that LPN Wells's supervision became onerous and overly critical following the investigation.

On September 21, after Naphcare informed Thompson that it could not substantiate her allegations, she tendered her letter of resignation. In it she stated that she was resigning on instructions from her doctor. Thompson now insists, however, that she had no choice but to resign and that Naphcare is responsible for her constructive discharge.

Thompson filed this complaint in January 2002, advancing claims of sexual harassment, hostile work environment, and constructive discharge — all under 42 U.S.C. § 2000e et seq. ("Title VII") — arising from advances allegedly made by Isaac while he was Thompson's supervisor at Naphcare. Thompson also claimed that Naphcare was liable under state law for intentional infliction of emotional distress, failure to enforce Title VII, and

6

constructive wrongful termination.  She later amended her complaint to add Title VII and state law wrongful termination claims against Isaac individually.  The district court dismissed Thompson's claims against Isaac for Title VII violations and wrongful termination, holding under Rule 12(b)(6) that Thompson had failed to state claims for which relief could be granted.  Following discovery, the district court granted Naphcare's summary judgment motion to dismiss all remaining claims, and this appeal ensued.  On appeal, Thompson only complains of the dismissal of her Title VII sexual harassment and constructive discharge claims against Naphcare and her state law emotional distress claims against Isaac.[2]

## II. ANALYSIS

### A. Standard of Review

The district court dismissed Thompson's claims against Naphcare on its motion for summary judgment and against Isaac for failure to state a claim.  We review both rulings de novo.[3]

### B. Sexual Harassment Claims Against Naphcare

---

[2] Thompson contends that she brought a state law claim for emotional distress in addition to her wrongful termination and Title VII claims against Isaac at the trial court level, and argues that the district court erred in not addressing this claim in its order granting Isaac's motion for dismiss for failure to state a claim.  As we conclude, infra, however, she did not state such a claim in her amended complaint.

[3] Gibson v. U.S. Postal Serv., 380 F.3d 886, 888 (5th Cir. 2004); Jackson v. City of Beaumont Police Dep't, 958 F.2d 616, 618 (5th Cir. 1992).

In a Title VII sexual harassment suit, the plaintiff must establish a prima facie case by showing that (1) she belongs to a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment was based on sex; (4) the harassment complained of affected a "term, condition or privilege of employment"; and (5) the employer knew or should have known of the harassment but failed to remedy the situation.[4] Thompson advanced sexual harassment claims of both the quid pro quo and the hostile work environment varieties. The former requires a showing of a tangible employment action to satisfy the fourth prong of the foregoing test; the latter requires a showing, in the absence of a tangible employment action, that a supervisor's harassment was nevertheless sufficiently severe or pervasive to alter a term or condition of employment.[5] This distinction makes a difference. An employer held vicariously liable for quid pro quo harassment on a finding that it took a tangible employment action toward an employee who either accepted or rejected a supervisor's sexual harassment is

---

[4] DeAngelis v. El Paso Mun. Police Officers Ass'n, 51 F.3d 591, 593 (5th Cir. 1995). The parties argue about whether we should employ the "motivating factor" analysis from the Supreme Court's recent Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003) decision in this case; as we hold that Thompson has not made out a prima facie case, there is no need to address this argument on appeal. See Rachid v. Jack in the Box, Inc., 376 F.3d 305, 312 (5th Cir. 2004) (holding Desert Palace's mixed motive analysis applicable in ADEA cases, but noting that plaintiffs still must demonstrate a prima facie case of discrimination).

[5] See Burlington Indus. v. Ellerth, 524 U.S. 742, 753-54 (1998). See also Jones v. Flagship Int'l, 793 F.2d 714, 719-20, 721-22 (5th Cir. 1986).

conclusively presumed to have had notice of the offending supervisor's conduct and will not be permitted to advance the affirmative defense enunciated by the Supreme Court in <u>Burlington Industries, Inc. v. Ellerth</u>[6] and <u>Faragher v. City of Boca Raton</u>.[7] In contrast, an employer that is found not to have taken a tangible employment action toward the harassed employee but is found to have maintained a hostile work environment by virtue of severe or pervasive supervisor sexual harassment may nevertheless advance the <u>Ellerth</u>/<u>Faragher</u> affirmative defense.[8]

Thus, when addressing a claim of supervisor sexual harassment, we must first determine whether an employee has suffered a tangible employment action.[9] An affirmative answer would demonstrate the existence of <u>quid</u> <u>pro</u> <u>quo</u> harassment and thus automatic employer

---

[6] 524 U.S. 742 (1998).

[7] 524 U.S. 775 (1998); <u>see</u> <u>Casiano v. AT&T Corp.</u>, 213 F.3d 278, 284 (5th Cir. 2000)(explaining that a finding of hostile environment will not result in vicarious liability if the employer can prove that it "exercised reasonable care to prevent and correct promptly any sexual harassment, and...the employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise," but that this affirmative defense is not available to an employer that has taken a tangible employment action.

[8] <u>See</u> <u>Casiano</u>, 213 F.3d at 283-84 (addressing the Supreme Court's "clear road map" for disposing of supervisor sexual harassment cases under Title VII as set out in <u>Burlington Indus. v. Ellerth</u>, 524 U.S. 742 (1998) and <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775 (1998)).

[9] <u>Casiano</u>, 213 F.3d at 284.

liability.[10]  In contrast, a conclusion that the employee was not

the object of a tangible employment action requires a determination

whether the supervisor's sexual harassment was nevertheless so

severe or pervasive that it created a "hostile environment."  Even

if we find such a condition to have been created, though, the

employer may escape vicarious liability by successfully advancing

the Ellerth/Faragher affirmative defense.[11]


1. Quid pro quo

As noted above, our initial inquiry is whether the employee

experienced a tangible employment action at all.  A tangible

employment action usually causes economic harm to an employee, yet

this is not always the case.[12]  A demotion or substantial diminution

in job responsibilities may also produce a tangible employment

action, even if the employee experiences no economic injury.[13]  The

purpose of Title VII is to remedy ultimate employment decisions,

not to challenge every interim action taken by an employer that may

have a tangential effect on an ultimate decision.[14]  Thus, to have

---

[10] Id.

[11] Id.

[12] Green v. Adm'r of Tulane Educ. Fund, 284 F.3d 642, 654 (5th Cir. 2002).

[13] See id. at 654-55 (citing Ellerth v. Burlington Indus., 524 U.S. 742, 761 (1998)).

[14] Dollis v. Rubin, 77 F.3d 777, 781 (5th Cir. 1995).

10

taken a tangible employment action, an employer must have made an employment decision.

We hold as a matter of law that Thompson failed to demonstrate that she suffered a tangible employment action at Naphcare.  She did not allege any diminution in her compensation or in her job responsibilities; neither did she allege that she was demoted.  Thompson alleged only  that (1) Isaac screamed at her for taking too long to go to the Juvenile Detention Center and gave her a written warning for the same conduct, (2) extended her probationary period an additional forty-five days, and (3) caused her work to be unduly scrutinized by Wells, an LPN.  None of these actions rises to the level of an ultimate employment decision; indeed, we have specifically held that increased criticism of an employee's work does not constitute a tangible employment action.[15]  Absent a tangible employment action, Thompson's quid pro quo claim fails.  The absence of a tangible employment action does not, however, prevent an employee from establishing the existence of a hostile work environment.

2. Hostile work environment

---

[15] See Messer v. Meno, 130 F.3d 130, 140 (5th Cir. 1997).  As we hold, infra, that Thompson has not stated a claim for constructive discharge either, this may not serve as a tangible employment action for her quid pro quo claim.  See Wyatt v. Hunt Plywood Co., Inc., 297 F.3d 405, 410 n.11 (5th Cir. 2002)(noting that the plaintiff had not advanced a coherent claim for constructive discharge and had therefore alleged no tangible employment action to support her charge of quid pro quo harassment).

For supervisor sexual harassment to be actionable as a hostile work environment claim, it must be "sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment."[16]  A sexually objectionable environment must be both objectively and subjectively offensive to give rise to a cause of action under Title VII.[17]  Determination of whether an environment is offensive or abusive requires an <u>ad hoc</u> analysis, "focusing on factors such as the frequency of the conduct, the severity of the conduct, the degree to which the conduct is physically threatening or humiliating, and the degree to which the conduct unreasonably interferes with an employee's work performance."[18]

Thompson contends that Isaac's behavior on the five specified occasions over the course of a month and a half created a hostile work environment:  two when he touched or rubbed her shoulders; another when he told her that she did not look her age; again when he told her that she had the figure of a college girl and asked to accompany her on vacation in the place of her husband; and, finally, when, in a private conference in his office, he told her that if she were not so wrapped up in her husband, she would "see what [Isaac] could do for her."  If verified, Isaac's actions would

---

[16] <u>Meritor Savings Bank v. Vinson</u>, 477 U.S. 57, 67 (1986).

[17] <u>Green</u>, 284 F.3d at 655.

[18] <u>Id.</u> at 655-56.

12

be boorish, offensive, and uncouth, particularly with respect to the last remark.[19]

Regardless, even if we were to assume arguendo that Isaac's actions did create a hostile working environment, we would exonerate Naphcare on its affirmative defense that (1) it took reasonable care to prevent the harassment and (2) Thompson unreasonably failed to take advantage of the preventative or corrective opportunities provided by Naphcare.[20] Naphcare presented evidence that its Employee Handbook, which Thompson acknowledges receiving, included a complaint procedure by which employees should directly contact a Human Resources manager regarding employment discrimination claims if the employee did not feel comfortable addressing the issue with their immediate supervisor or other manager. Also, once Naphcare received Thompson's complaint, it immediately sent two high level executives to Thompson's worksite to investigate her claims. And, even though they could not substantiate Thompson's claims, these investigators forbade Isaac to have solo encounters with Thompson. Inasmuch as Thompson did not allege any further sexually harassing conduct on the part of Isaac after completion of the investigation by Naphcare, the employer's response to her complaints was not ineffectual. By

_____

[19] See, e.g., Jones v. Flagship Int'l, 793 F.2d 714, 720-21 (5th Cir. 1986) (holding that a supervisor's sexual propositioning of an employee on three separate occasions was not sufficiently severe or pervasive to create a hostile working environment).

[20] See Casiano, 213 F.3d at 284.

13

taking these actions, Naphcare exercised reasonable care to prevent and correct promptly this alleged sexual harassment in the workplace.[21] Conversely, by waiting almost two months to register her complaints and then resigning almost immediately after Naphcare's prompt investigation and remedial actions, Thompson can not be said to have acted reasonably.[22]

C. Constructive Discharge Claim Against Naphcare

Thompson also asserted that Isaac's harassing conduct, followed by his increased criticism and supervision of her work, caused her to be constructively discharged. To demonstrate constructive discharge, a plaintiff must prove that working conditions were so intolerable that a reasonable person in the plaintiff's position would feel compelled to resign.[23] An employee's obligation of reasonableness requires that she not jump to conclusions and not assume the worst.[24] Whether a reasonable employee would feel compelled to resign depends on the circumstances, with special consideration, inter alia, of seven

---

[21] See id.

[22] See Wyatt v. Hunt Plywood Co., Inc., 297 F.3d 405, 413 (5th Cir. 2002)(holding that the plaintiff's refusal to report supervisor's discriminatory conduct to his next higher supervisor according to company policy was unreasonable and resulted in no vicarious liability for the employer).

[23] Webb v. Cardiothoracic Surgery Assoc. of North Tex., 139 F.3d 532, 539 (5th Cir. 1998).

[24] Dornhecker v. Malibu Grand Prix Corp., 828 F.2d 307, 310 (5th Cir. 1987) (citations omitted).

14

non-exclusive factors: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; and (7) offers of continued employment on terms less favorable than the employee's former status.[25] Thompson did not prove the presence of any of these factors. Thompson also failed to present any other evidence sufficient to show that her working conditions were intolerable.[26]

Taken together, Thompson's allegations amount to five instances of putative sexual harassment, a few occasions on which she was more harshly reprimanded by her supervisor than she believes was warranted, and overly strict supervision by an LPN whom Thompson believed to be unqualified to supervise her work. As to the harassing conduct, Naphcare unquestionably took prompt remedial action, and Thompson does not allege that Isaac's discriminatory behavior continued after the investigation.[27] As to the increased supervision and criticism, this took place over a

---

[25] Barrow v. New Orleans S.S. Ass'n, 10 F.3d 292, 297 (5th Cir. 1994).

[26] See Ward v. Bechtel Corp., 102 F.3d 199, 202 (5th Cir. 1997).

[27] See Wells, 139 F.3d at 539-40 ("The summary judgment evidence reflects that [the employer] took prompt remedial action to prevent any future harassment. This factor alone is fatal to [the plaintiff's] claim of constructive discharge.").

15

period of no more than two weeks in early September 2000, after which Thompson took medical leave and then resigned. We are satisfied that the incidents alleged by Thompson to have created an intolerable working environment were not of a sufficient magnitude to do so. We are also satisfied that an employee who resigns without affording the employer a reasonable opportunity to address her concerns has not been constructively discharged.[28] Like her sexual harassment claims, Thompson's constructive discharge claim against Naphcare fails.

D. Claims Against Isaac

In granting Isaac's Rule 12(b)(6) motion, the district court dismissed all of Thompson's claims against him. Thompson argues on appeal that, even if the district court did not err as to her other claims against Isaac, it erred in failing to address her claim against him for intentional infliction of emotional distress. As Thompson did not raise such a claim against Isaac in her amended complaint, however, she may not raise it for the first time on

---

[28] See Brown v. Kinney Shoe Corp., 237 F.3d 556, 566 (5th Cir. 2001)(holding that the plaintiff had not shown constructive discharge by alleging that he had been transferred to a less profitable store than the one at which he had previously worked, "particularly in light of the fact that he was pursuing an EEOC remedy that could have addressed any discrimination he suffered. . ."). See also Boze v. Branstetter, 912 F.2d 801, 805 (5th Cir. 1990)(holding that, in most cases, a reasonable employee would pursue internal remedies or file an EEOC complaint before resigning, and that employees best serve the purposes of Title VII if they attack discrimination within the context of the employment relationship).

16

appeal.[29]  We affirm the court's dismissal of all claims against Isaac.

## III. CONCLUSION

For the foregoing reasons, all rulings of the district court appealed by Thompson are

AFFIRMED.

---

[29] See North Alamo Water Supply Corp. v. City of San Juan, 90 F.3d 910, 916 (5th Cir. 1996).