**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**June 28, 2007**

**Charles R. Fulbruge III**
**Clerk**

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

))))))))))))))))))))))))))))

No. 06-50102

))))))))))))))))))))))))))))

SUZAN RUSSELL,

Plaintiff-Appellant,

versus

UNIVERSITY OF TEXAS OF THE PERMIAN BASIN,

Defendant-Appellee.

---

Appeal from the United States District Court
for the Western District of Texas
No. MO-04-CV-131

---

Before KING, GARZA, and PRADO, Circuit Judges.

PER CURIAM:[*]

Plaintiff-Appellant Dr. Suzan Russell ("Dr. Russell") sued her former employer, the University of Texas of th e Permian Basin ("UTPB"), under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., alleging gender discrimination, sexual harassment, and retaliation. The district court denied UTPB's motion for summary judgment as to gender discrimination, but granted its motion regarding the sexual harassment and retaliation claims. Dr.

---

[*] Pursuant to 5TH CIRCUIT RULE 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIRCUIT RULE 47.5.4.

Russell's gender discrimination claim proceeded to trial, and the jury returned a verdict in favor of UTPB. Dr. Russell now appeals the district court's order with respect to the sexual harassment and retaliation claims. Additionally, Dr. Russell appeals the district court's denial of her proposed jury instruction on spoliation.

## I. FACTUAL AND PROCEDURAL HISTORY

UTPB hired Dr. Russell in July 2002 to fill a one-year, non-tenure track position as a Visiting Assistant Professor in English in the Department of Humanities and Fine Arts ("the Department"). In October 2002, Dr. Russell also accepted a non-tenure track, one-year appointment as the Faculty Advisor to The Mesa Journal, UTPB's campus newspaper.

Dr. Russell alleges that, beginning in September 2002 and continuing through May 2003, Dr. Sarah Shawn Watson ("Dr. Watson"), her supervisor and Chair of the Department at that time, sexually harassed her. The alleged harassment consisted of both suggestive remarks and provocative touching. Specifically, Dr. Russell alleges that Dr. Watson: (1) "provocatively rubbed the side" of her hand; (2) called her "honey" and "babe" on numerous occasions from September 2002 through May 2003; (3) said to her "I wouldn't mind watching the movie in bed with you"; (4) once rubbed Dr. Russell's thigh with her hand while in Dr. Russell's office; and (5) sat next to her and said "I want to move to NYC," which Dr. Russell understood as implying that Dr. Watson wanted to live with her.

2

Meanwhile, in November 2002, Dr. Russell applied for an open tenure-track position in Nineteenth Century American Literature. A committee composed of six UTPB professors was chosen to select a candidate to fill the open position. Dr. Watson chaired the committee, and Drs. Sophia Andres, Mark Wildermuth, Joanna Hadjicostandi, Ken Sherwood, and Richard Spence comprised the remainder of the committee. UTPB received between seventy and eighty applications for the position. The committee reviewed the applications, and decided to interview approximately eighteen candidates at the Modern Language Association Convention ("the Convention") in December 2002. Drs. Watson, Sherwood, and Wildermuth interviewed the candidates at the Convention and selected three finalists from that group. Though Dr. Russell was unable to attend the Convention, Drs. Watson, Sherwood, and Wildermuth gave her a Convention-style interview on-campus in February 2003. After interviewing Dr. Russell, the full committee considered the applications of the three finalists plus Dr. Russell.

The full committee decided to invite two finalists, Dr. Todd Richardson and Caroline Miles, for on-campus interviews. At this point, Dr. Russell was out of the running. The full committee unanimously recommended Dr. Richardson for the open tenure-track position. The committee did not, however, have the ultimate authority to hire Dr. Richardson. The committee's recommendation had to be accepted by Dr. Olsen, the Dean of the College of Fine Arts and Sciences. After accepting the committee's recommendation,

3

Dr. Olsen had to pass the recommendation to Dr. Fannin, the Vice President of Academic Affairs, for final approval.  UTPB offered the tenure-track position to Dr. Richardson after Drs. Olson and Fannin concurred in the committee's recommendation.

In March 2003, Dr. Watson informed Dr. Russell that she had not been selected for the position, and she attributed Dr. Russell's failed candidacy to her lack of publication.[1]  Though Dr. Russell was not selected for the tenure-track position, in June 2003, UTPB offered to extend her appointments as the Faculty Advisor to The Mesa Journal and as a Visiting Assistant Professor of English for the 2003-2004 academic year.  Dr. Russell accepted the extension.

Though Dr. Russell agreed to renew her appointments for another year in June 2003, she alleges that Dr. Watson began to treat her unfavorably after she rejected Dr. Watson's sexual advances.  Dr. Russell contends that Dr. Watson excluded her from departmental meetings, cancelled some of her classes, and refused to give her desired class assignments.  These incidents prompted Dr. Russell to file an informal grievance against Dr. Watson in October 2003.[2]

In April 2004, UTPB informed Dr. Russell that it would not

---

[1] Dr. Russell alleges that, at this meeting, Dr. Watson asked her what she was going to do now that she was not getting the tenure-track position.  Dr. Russell replied that was going back to New York City, to which Dr. Watson allegedly responded "I will be two steps behind you when you go."  Dr. Russell asked Dr. Watson what she meant by this and, according to Dr. Russell, Dr. Watson nervously got up and walked out.

[2] Dr. Russell had filed a sexual harassment grievance against Dr. Patricio Jaramillo in April 2003.

renew her contract as a Visiting Assistant Professor. UTPB did, however, invite Dr. Russell to apply for a new non-tenure track position as Director of The Mesa Journal. Dr. Russell had previously expressed an interest in the position as a means of remaining at UTPB. She alleges that the appointment had been originally represented to her as an "open rank position," which, according to Dr. Russell, meant that the position could eventually result in a tenured professorship. In her complaint, Dr. Russell explains that she rejected the offer because the position, as defined in the invitation, was a non-tenure track, lecturer position with a master's degree as the minimum qualification. The position was unsuitable, she believed, for someone of her professional status.[3]

On September 27, 2004, Dr. Russell sued UTPB under Title VII, alleging gender discrimination and retaliation. Dr. Russell alleges that her rejection of Dr. Watson's unwelcome sexual advances led to the rejection of her application for the tenure-track position, denial of requested class assignments, attempts to remove her from the Department, and exclusion from faculty meetings. Dr. Russell filed an amended complaint on January 4, 2005, adding a sexual harassment claim. UTPB filed a motion for summary judgment on all claims. The district court denied the motion with respect to the gender discrimination claim, but granted it on the sexual harassment

[3] Dr. Russell has a Ph.D. from New York University and had experience teaching at a number of colleges and universities.

and retaliation claims.

Dr. Russell's gender discrimination claim went to trial on December 8, 2005. At the conclusion of evidence, Dr. Russell requested that the district court include an instruction on spoliation of evidence in its jury charge. The district court denied the request. The jury returned a unanimous verdict in favor of UTPB. The district court entered final judgment on the jury's verdict on December 16, 2005.

Dr. Russell now appeals the district court's order granting UTPB's motion for summary judgment on the sexual harassment and retaliation claims and the district court's denial of her proposed jury instruction on spoliation.

## II. JURISDICTION AND STANDARD OF REVIEW

Dr. Russell appeals a final judgment of the district court, so this court has jurisdiction over the appeal under 28 U.S.C. § 1291.

We review a summary judgment de novo. Dallas County Hosp. Dist. v. Assocs. Health & Welfare Plan, 293 F.3d 282, 285 (5th Cir. 2002). Summary judgment is proper when the pleadings, discovery responses, and affidavits show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. FED. R. CIV. P. 56(c). A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). When deciding whether there is a genuine issue of material fact, this court must view all

6

evidence in the light most favorable to the non-moving party. Daniels v. City of Arlington, 246 F.3d 500, 502 (5th Cir. 2001).

### III. DISCUSSION

A.   Sexual Harassment

In Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75 (1998), the Supreme Court held that Title VII prohibits same-sex sexual harassment. The Supreme Court stressed, however, that, like all plaintiffs alleging sexual harassment, the employee claiming same-sex harassment must "prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimination because of sex." Id. at 81 (internal quotation marks and alterations omitted).

This circuit has established a two-step process for evaluating same-sex sexual harassment cases. See, e.g., La Day v. Catalyst Tech., Inc., 302 F.3d 474 (5th Cir. 2002). Per Oncale, in La Day, we determined that the employee must first demonstrate that the sexual harassment was "discrimination because of sex." Id. at 478. The employee may make this showing by: (1) establishing that the harasser made "explicit or implicit proposals of sexual activity and providing credible evidence that the harasser was homosexual;" (2) demonstrating that the harasser was "motivated by general hostility to the presence of members of the same sex in the workplace;" or (3) offering "direct, comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace."

7

Id.  In this case, Dr. Russell has created a fact issue that the sexual harassment was discrimination because of sex since Dr. Russell put on evidence that Dr. Watson made sexual advances to her and it is undisputed that both Dr. Russell and Dr. Watson are lesbians.

If the employee establishes that the same-sex sexual harassment was discrimination because of sex, then the court must decide whether the alleged conduct meets the applicable standards for either a quid pro quo or hostile work environment claim.  La Day, 302 F.3d at 478.[4]  Whether the employee suffered a tangible employment action determines whether we analyze the claim as a quid pro quo sexual harassment claim or as a hostile work environment claim.  Casiano v. AT&T Corp., 213 F.3d 278, 283 (5th Cir. 2000).  A tangible employment action constitutes "a significant change in employment status such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998).  If the employee experienced a tangible employment action, then the case moves forward as a quid pro quo claim; if not, then it proceeds as a hostile work environment claim.  Casiano, 213 F.3d at 283.  Here, there was a tangible employment action because UTPB failed to promote Dr. Russell to the tenure-track position in American

---

[4] At this point, the court uses the same analysis for all types of sexual harassment cases, including same-sex sexual harassment.

Literature.

### 1. Quid Pro Quo Claim

For Dr. Russell to succeed on a quid pro quo harassment claim, she must show that (1) she suffered a tangible employment action and (2) the tangible employment action resulted from her acceptance or rejection of her supervisor's alleged sexual advances. La Day, 302 F.3d at 481 (citing Casiano, 213 F.3d at 283). In other words, in order to survive summary judgment, Dr. Russell must demonstrate a genuine issue of material fact regarding whether Dr. Watson, her alleged harasser, took a tangible employment action against her because she rejected Dr. Watson's sexual advances. See Casiano, 213 F.3d at 284-85 (finding no tangible employment action when an employee was denied access to a training program because another manager, not the harassing supervisor, was responsible for the decision); see also Durkin v. City of Chi., 341 F.3d 606, 611 (7th Cir. 2003) ("When a supervisor engages in sexual harassment, the employer is liable for the harassment only if the harasser took a tangible employment action as part of his harassment.") (citing Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998)). If the employee proves that the tangible employment action resulted from her acceptance or rejection of her supervisor's sexual advances, then the employer is vicariously liable, and may not assert the Ellerth/Faragher affirmative defense.[5] Casiano, 213 F.3d at 284.

---

[5] The affirmative defense consists of two prongs, both of which the employer must fulfill: "(a) that the employer exercised

9

In this case, the district court rejected Dr. Russell's quid pro

claim because it concluded that Dr. Russell "failed to establish

that the tangible employment action resulted from [her] rejection of

Dr. Watson's alleged advances."  We agree.

Needless to say, Dr. Russell contends that she demonstrated

that her failure to receive the tenure-track position resulted from

her rejection of Dr. Watson's unwanted sexual advances.  As proof of

causation, Dr. Russell submits that she established a "close

temporal proximity" between her rejection of the advances and her

failure to gain the promotion.  The fact that Dr. Watson

participated in the hiring decision, Dr. Russell argues, helps to

create a genuine issue of material fact as to causation.  Finally,

Dr. Russell maintains that numerous instances of post-rejection

animus such as depriving her of desired class assignments

demonstrate causation.  According to Dr. Russell, the combination of

temporal proximity, Dr. Watson's participation in the tenure

decision, and the post-rejection animus provides sufficient evidence

of causation to survive UTPB's summary judgment motion.

Though we have often held that evidence of close temporal

proximity can serve as proof of causation for retaliation claims,

see, e.g., Evans v. City of Houston, 246 F.3d 344, 354 (5th Cir.

---

reasonable care to prevent and correct promptly any sexually
harassing behavior, and (b) that the plaintiff employee
unreasonably failed to take advantage of any preventive or
corrective opportunities provided by the employer or to avoid harm
otherwise."  Ellerth, 524 U.S. at 765.

10

2001), we have never used such evidence as proof of causation for quid pro quo claims. Some of our sister circuits have accepted temporal proximity as proof of causation in quid pro quo cases, but we need not reach this issue in this instance. See Cotton v. Cracker Barrel Old Country Store, Inc., 434 F.3d 1227, 1232 (11th Cir. 2006) (stating "temporal proximity between the harassment and the tangible employment action can give rise to a genuine issue of fact as to causation"); Farrell v. Planters Lifesavers Co., 206 F.3d 271, 285 (3d Cir. 2000) (holding that the timing of appellant's termination was suggestive of causation for both the retaliation and the quid pro quo claims). Irrespective of whether there was close temporal proximity between Dr. Russell's rejection of Dr. Watson's sexual advances and Dr. Russell's failure to attain the tenure-track position, we hold that there was no causation because Dr. Russell has not shown that her alleged harasser, Dr. Watson, made the decision not to promote her.

Dr. Russell's quid pro quo sexual harassment claim cannot withstand UTPB's motion for summary judgment because she has failed to demonstrate that Dr. Watson caused the tangible employment action. In other words, she has presented no competent summary judgment evidence that her alleged harasser was responsible for the decision not to hire her for the tenure-track position. See Casiano, 213 F.3d at 284-85 (finding no tangible employment action where an employee was denied access to a training program because another manager, not the harassing supervisor, was responsible for

11

the decision); Cf. Long v. Eastfield Coll., 88 F.3d 300, 307 (5th Cir. 1996) (stating that the "causal link" between retaliatory intent and adverse employment action is broken if those with the retaliatory intent are not responsible for the adverse employment action). The search committee, and not Dr. Watson, made the initial recommendation to hire Dr. Richardson, and that recommendation did not become final until Drs. Olson and Fannin approved it. We have, however, held that "if the employee can demonstrate that [those with discriminatory intent] had influence or leverage over the official decisionmaker . . . it is proper to impute their discriminatory attitudes to the formal decisionmaker." Russell v. McKinney Hosp. Venture, 235 F.3d 219, 226 (5th Cir. 2000). In addition to cases of influence or leverage, the Russell court recognized that the ultimate decisionmaker could inherit the taint of discriminatory intent if he "merely acted as a rubber stamp, or the 'cat's paw,' for a subordinate employee's prejudice, even if the manager lacked discriminatory intent." Id. at 227.

In Laxton v. Gap Inc., 333 F.3d 572 (5th Cir. 2003), a Pregnancy Discrimination Act case, we held that Laxton had presented sufficient evidence of causation even though the supervisor with the discriminatory animus, Karen Jones, was not directly responsible for her termination. Mary Carr and Carla Dotto fired Laxton for various violations of company policy. Id. at 584-85. Carr testified that she relied on Jones for the facts underlying the violations. Carr's reliance on Jones provided sufficient evidence of Jones's influence

12

over the ultimate decisionmakers to demonstrate causation.

We reached a similar conclusion in Gee v. Principi, 289 F.3d 342 (5th Cir. 2002), a sexual harassment case brought under Title VII. Sinda Gee, an employee at the Veteran Affairs Medical Center in Waco, Texas, reported to Wallace Hopkins, the director of the center, that she had been sexually harassed by Dr. John Bryan. Id. at 344. Gee applied for a new job within the medical center, but Lee Gibbs, the Information Resources Management chief, hired someone else for the position. Id. at 344-45. Prior to denying Gee the position, Gibbs was present at a meeting attended by, among others, Dr. Bryan, Hopkins, Wallace, and Dr. Gary Melvin. Dr. Melvin testified that Gee's fate was sealed at the meeting when Dr. Bryan, the alleged harasser, and Hopkins, who knew about the harassment, made derogatory comments about Gee. Id. at 347. We held that Gee provided sufficient evidence that Gibbs was improperly influenced by Dr. Bryan and Hopkins when he made the decision not to hire Gee. This influence created a fact issue regarding causation.

Unlike the appellants in Laxton and Gee, Dr. Russell has presented no competent summary judgment evidence that Dr. Watson exercised influence over any of the other decisionmakers in this case, namely, the other committee members, Dr. Olson, and Dr. Fannin. The six-person search committee unanimously selected Dr. Richardson as their choice to fill the tenure-track position. Dr. Richardson was therefore the search committee's choice, and not the personal choice of Dr. Watson. Without any evidence that Dr. Watson

13

influenced the committee, we cannot impute Dr. Watson's allegedly discriminatory animus to the committee's selection.  Cf. Russell, 235 F.3d at 226.  Though Dr. Watson was the chair of the committee, Dr. Russell has introduced no evidence that being chair entitled Dr. Watson to a greater voice in the proceedings than other members of the committee.  Furthermore, the record does not reflect that any other members of the committee knew about the alleged sexual harassment at the time of the hiring decision.[6]

Admittedly, the record does contain some indication that Dr. Watson might have influenced the committee's decision, but it is not competent summary judgment evidence.  At her deposition, Dr. Russell testified that Dr. W. David Watts, the president of UTPB, told her that he could not give her a tenure-track job because Dr. Watson did not believe she was qualified.  This evidence does not create a fact issue concerning the tenure-track job in Nineteenth Century American Literature because Dr. Watts played no role in filling that position.  The search committee recommended Dr. Richardson and Drs. Olson and Fannin approved the recommendation.  Dr. Russell also testified that Dr. Andres, a member of the search committee, told her that Dr. Watson said "some really nasty things" about Dr.

---

[6] Dr. Russell testified at her deposition that she told Dr. Andres about Dr. Watson's alleged sexual harassment in March 2003 and that she informed Dr. Olson in October 2003.  Though both Drs. Andres and Olson participated in the hiring process, it is clear from Dr. Russell's deposition that they did not learn of Dr. Watson's allegedly harassing conduct until after the hiring decision had been made.

Russell during the search process and that Dr. Watson "did [Dr. Russell] in" during the committee meetings.  This testimony is, of course, inadmissible hearsay, and is therefore not competent summary judgment evidence.  See Warfield v. Byron, 436 F.3d 551, 559 (5th Cir. 2006) (noting that hearsay evidence is inadmissible for summary judgment purposes under Federal Rule of Civil Procedure 56).

Even if we were to assume that the committee's choice was imbued with Dr. Watson's allegedly discriminatory animus, Dr. Russell would have to surmount additional hurdles by demonstrating that Dr. Watson either influenced Drs. Olson and Fannin or that they merely rubber stamped the committee's recommendation without an independent review.  Cf. Russell, 235 F.3d at 226-27; but see Long, 88 F.3d at 307 (holding that the degree to which the ultimate decisionmaker based his decision on an independent investigation is a question of fact reserved for the jury).  She has not done so.

For the reasons stated above, we hold that Dr. Russell's sexual harassment claim cannot survive summary judgment under a quid pro quo theory because she has not provided sufficient evidence to show that she suffered a tangible employment action that resulted from her rejection of Dr. Watson's alleged sexual advances.

2.    Hostile Work Environment Claim

Though Dr. Russell cannot demonstrate that UTPB is liable for sexual harassment under a quid pro quo theory, her sexual harassment claim might defeat summary judgment if she could create a fact issue regarding whether Dr. Watson's alleged harassment created a hostile

15

work environment. See La Day, 302 F.3d at 482. In order to prevail on a hostile work environment claim, Dr. Russell would have to demonstrate that: (1) she belongs to a protected group; (2) she was subjected to unwelcome sexual harassment; (3) the harassment complained of was based on sex; and (4) it affected a term, condition, or privilege of employment. Watts v. Kroger Co., 170 F.3d 505, 509 (5th Cir. 1999) (setting out the elements of a hostile work environment claim when the alleged harasser is a supervisor). UTPB is liable for Dr. Watson's harassment if Dr. Russell can prove that the harassment created a hostile work environment, but, in the absence of a tangible employment action, UTPB may assert the Ellerth/Faragher affirmative defense. Id. 509-10. Only the fourth element is disputed.

Sexual harassment affects a term, condition, or privilege of employment when it is "severe or pervasive." La Day, 302 F.3d at 482. Furthermore, "[i]n order to be actionable under Title VII, a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Id. Whether a work environment meets this standard "depends on 'all the circumstances,' including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id.

16

The district court did not err in granting summary judgment on Dr. Russell's sexual harassment claim because, viewed in light of all circumstances, Dr. Watson's alleged conduct was neither severe nor pervasive. Dr. Russell alleges that, on one occasion each, Dr. Watson rubbed the side of her hand and her thigh; that Dr. Watson twice intimated that she wanted to move to New York City with Dr. Russell; that Dr. Watson once stated that she would not mind watching a movie in bed with Dr. Russell; and that Dr. Watson called her "honey" or "babe" on numerous occasions. These actions are no more severe than those in previous cases where this court has held that the employee did not demonstrate a hostile work environment. For example, in <u>Hockman v. Westward Communications, LP</u>, 407 F.3d 317, 327-28 (5th Cir. 2004), we held that, as a matter of law, the appellant could not establish a hostile work environment based on the facts that the alleged harasser, among other things, commented about another employee's body, slapped her on the behind with a newspaper, grabbed or brushed against her breast and behind, and once attempted to kiss her. At best, Dr. Russell's allegations are on the same plane as those we found insufficient to establish "severe or pervasive" harassment in <u>Hockman</u>. We therefore hold that Dr. Watson's allegedly harassing behavior did not create a hostile work environment.

B.  <u>Retaliation</u>

In addition to her sexual harassment claim, Dr. Russell contends that UTPB violated the law by retaliating against her after

17

she engaged in activities protected by Title VII. To establish a prima facie case of retaliation, Dr. Russell must demonstrate that: (1) she engaged in a statutorily protected activity, (2) she suffered an adverse employment action, and (3) there was a causal link between the protected activity and the adverse employment action. Webb v. Cardiothoracic Surgery Assoc., 139 F.3d 532, 540 (5th Cir. 1998). The causal link need not rise to the level of "but for" causation at the prima facie stage. Gee v. Principi, 289 F.3d 342, 345 (5th Cir. 2002). Once the employee has established a prima facie case, the burden then shifts to the employer to demonstrate a legitimate, non-retaliatory reason for the adverse employment action. Id. If the employer satisfies this burden, then the employee must demonstrate that the employer's non-retaliatory purpose is "merely a pretext for the real, [retaliatory] purpose." Id.

The district court found that Dr. Russell satisfied the first two elements. Dr. Russell engaged in a protected activity on three occasions, namely, when she filed a sexual harassment grievance against Dr. Jaramillo in April 2003, when she began an informal grievance against Dr. Watson in October 2003, and when she filed an EEOC complaint on May 11, 2004. The district court determined that an adverse employment action occurred when UTPB refused to renew Dr. Russell's contract in April 2004. Dr. Russell, according to the district court, could not establish a prima facie case of retaliation because she could not show a causal connection between

18

the protected activities and the adverse employment action. The district court explained that Dr. Russell presented no direct evidence of a causal link and that too much time had elapsed between her protected activities (April 2003 and October 2003) and the adverse employment action (April 2004) to infer a causal link solely from temporal proximity.

The district court ruled on the summary judgment motion before the Supreme Court decided <u>Burlington Northern & Santa Fe Railway Co. v. White</u>, 126 S. Ct. 2405 (2006), which rejected the approach taken by several circuits, including this one, for determining adverse employment actions in retaliation cases. Prior to <u>Burlington Northern</u>, this circuit had held that only an "ultimate employment decision" such as "hiring, granting leave, discharging, promoting or compensating" constituted an adverse employment action. <u>See, e.g.</u>, <u>Ackel v. Nat'l Commc'ns, Inc.</u>, 339 F.3d 376, 385 (5th Cir. 2003). Instead of the "ultimate employment decision" standard, the Supreme Court in <u>Burlington Northern</u> held that an employee suffers an adverse employment action if "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." 126 S. Ct. at 2415 (internal quotation marks omitted).

Though the district court held that the non-renewal of Dr. Russell's contract constituted an adverse employment action under this circuit's more stringent pre-<u>Burlington Northern</u> standard, we

19

decline to decide whether non-renewal of a contract amounted to an adverse employment action in this instance.[7] Nevertheless, we affirm the district court's ruling because Dr. Russell has failed to establish a causal connection between her grievance and the non-renewal of her contract. Dr. Russell argues that she has presented temporal proximity evidence which creates an inference of causation. We disagree. Numerous courts have held that temporal proximity evidence alone cannot support an inference of causation when there is a four-month gap between the protected activity and the adverse employment action. See Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273-74 (2001) (surveying temporal proximity cases and noting cases have found a lapse of up to three or four months too large to support causation); but see Evans v. City of Houston, 246 F.3d 344, 354 (5th Cir. 2001) (noting that a district court has found a four-month gap sufficient to establish causation). We cannot infer causation in this case because the temporal proximity evidence shows a six-month gap between Dr. Russell's filing of the grievance (October 2003) and the non-renewal of the contract (April 2004).

Admittedly, in Shirley v. Chrysler First, Inc., 970 F.2d 39 (5th Cir. 1992), we held that a causal nexus existed between the protected activity and the adverse employment action after a passage

---

[7] UTPB has asserted, and Dr. Russell does not deny, that her visiting assistant professor contract could not be extended beyond a second year. Furthermore, Dr. Russell has presented no evidence that UTPB has violated its official policy by occasionally extending visiting professorships beyond two years.

of fourteen months. In that case, however, the appellant did not rest on temporal proximity alone. The appellant presented evidence that her boss complained to her about the EEOC complaint and that criticisms of her work performance only arose <u>after</u> she filed the complaint. <u>Id.</u> at 43. Here, Dr. Russell does not allege that Dr. Watson harangued her about the grievance, and the record shows that many of the problems between the two--such as Dr. Russell's failure to get desired course assignments and the cancellation of her classes--began <u>before</u> Dr. Russell filed her October 2003 grievance. For example, Dr. Watson had learned by September 2003, at the latest, that she would not get her desired course assignments for the fall 2003 semester.

Though we affirm the district court's holding that Dr. Russell has not presented sufficient evidence to create a fact issue regarding whether her grievances caused UTPB not to renew her contract, our inquiry into her retaliation claim does not end here. In Dr. Russell's complaint and in her opposition to UTPB's motion for summary judgment, she alleged that UTPB unlawfully retaliated against her by downgrading the Director of <u>The Mesa Journal</u> position in April 2004. The district court did not address this allegation, and instead focused its analysis exclusively on the non-renewal of Dr. Russell's contract. Dr. Russell cannot establish a prima facie case of retaliation concerning the downgrading of <u>The Mesa Journal</u> position for the same reason that she failed to establish a prima facie case for the non-renewal of her contract: too much time

21

elapsed between her protected activities (April 2003 and October 2003) and the alleged adverse employment action (April 2004) to support an inference of causation. Put differently, evidence of temporal proximity alone cannot sustain an inference of causation when there is a six-month gap between the protected activity and the alleged adverse employment action.

C.  Spoliation

Unlike Dr. Russell's sexual harassment and retaliation claims, her gender discrimination claim proceeded to trial. UTPB used a ranking system, the Likert scale, to rank candidates for the tenure-track position in Nineteenth Century American Literature. The documents containing each committee member's scoring of the candidates were destroyed. Based on the destruction of the Likert scale documents, Dr. Russell requested a jury instruction on spoliation of the evidence by UTPB. A spoliation instruction entitles the jury to draw an inference that a party who intentionally destroys important documents did so because the contents of those documents were unfavorable to that party. See Vick v. Tex. Employment Comm'n, 514 F.2d 734, 737 (5th Cir. 1975). The district court denied the requested jury instruction and Dr. Russell now appeals that ruling.

We review a district court's refusal to give a requested jury instruction for abuse of discretion. United States v. Cain, 440 F.3d 672, 674 (5th Cir. 2006). The district court retains "substantial latitude in formulating its jury charge," and we may

22

reverse "only if the requested instruction is substantially correct; was not substantially covered in the charge as a whole; and if the omission of the requested instruction seriously impaired the defendant's ability to present a given defense." Id.

Furthermore, a plaintiff is entitled to a jury instruction on spoliation only if the plaintiff can show that the defendant acted in "bad faith." Condrey v. Suntrust Bank of Ga., 431 F.3d 191, 203 (5th Cir. 2003). "[M]ere negligence is not enough" to warrant an instruction on spoliation. Vick, 514 F.2d at 737.

The district court did not abuse its discretion in denying Dr. Russell's requested jury charge on spoliation because she has not shown that UTPB destroyed the records in bad faith. Typically, we do not draw an inference of bad faith when documents are destroyed under a routine policy. See Vick, 514 F.2d at 737; see also Coates v. Johnson & Johnson, 756 F.2d 524, 551 (7th Cir. 1985) (declining to make inference of bad faith when documents were destroyed according to routine procedures). Here, the uncontroverted trial testimony from Drs. Watson and Andres establishes that UTPB has a policy of destroying the Likert documents after an open position has been filled. At trial, Dr. Watson's testimony suggested that the Likert documents are typically destroyed two years after a position has been filled. If the documents were destroyed according to this procedure, that would place their destruction in March 2005, well after Dr. Russell filed her EEOC complaint (May 11, 2004) and the present lawsuit (September 27, 2004). Dr. Watson later testified,

23

however, that she did not know whether Dr. Russell's documents were destroyed with the other unsuccessful candidates' files or at the end of the committee meeting.

The district court stated that it would not give the spoliation instruction because there was no evidence that UTPB destroyed the Likert documents after it knew of Dr. Russell's claims. Though we do not automatically draw an inference of bad faith simply because documents are destroyed after the initiation of litigation, see Vick, 514 F.2d at 737, Dr. Russell would have had a stronger argument for spoliation had she been able to prove that the documents were destroyed after UTPB had notice of their relevance to her claim, see Nation-Wide Check Corp. v. Forest Hills Distributors, Inc., 692 F.2d 214, 218 (1st Cir. 1982). The evidence produced at trial did not establish when the documents were destroyed, for they could have been destroyed either two years after the hiring decision or at the conclusion of the committee meeting. We cannot conclude, based on this inconclusive evidence, that the district court abused its discretion in denying the spoliation charge.

Assuming for the sake of argument that UTPB did act in bad faith when it destroyed the Likert documents, we may not upset the district court's ruling unless the omission of the requested instruction seriously impaired Dr. Russell's ability to present her case. Cf. Cain, 440 F.3d at 674. The fact that the jury did not hear the spoliation instruction did not seriously impair Dr. Russell's ability to present her case because the jury heard

24

testimony that the documents were important and that they were destroyed. The jury was free to weigh this information as it saw fit. Furthermore, counsel for Dr. Russell had the opportunity to question members of the search committee regarding how they ranked the candidates for the tenure-track position. Given these facts, the district court did not abuse its discretion in denying Dr. Russell's proposed jury instruction on spoliation.

## IV. CONCLUSION

For the reasons stated above, we AFFIRM the decision of the district court.

AFFIRMED.