# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

December 19, 2011

Lyle W. Cayce
Clerk

No. 10-31169

MARY EVELYN SCHROEDER,

Plaintiff-Appellant

v.

GREATER NEW ORLEANS FEDERAL CREDIT UNION, also known as
GNO Federal Credit Union; CUMIS INSURANCE SOCIETY, as insurer for
Greater New Orleans Federal Credit Union, incorrectly named CUNA Mutual
Insurance Society,

Defendants-Appellees

Appeal from the United States District Court
for the Eastern District of Louisiana

Before KING, DAVIS, and GARZA, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Appellant Mary Schroeder ("Schroeder") appeals the district court's grant
of summary judgment for Appellees Greater New Orleans Federal Credit Union
("GNOFCU") and Cumis Insurance Society ("Cumis").

The district court found that GNOFCU did not violate either the Federal
Credit Union Act, 12 U.S.C. § 1790b, or LA. REV. STAT. ANN. § 23:967(A) by
terminating Schroeder's employment after she complained of possible fraud in
the company's lending practices. On appeal, Schroeder contends that the district
court ignored evidence of her complaints and of the causal link between her

complaints and her demotion, pay decrease, and termination. Subsumed in Schroeder's appeal is the question of whether the district court interpreted § 1790b too narrowly. Although we do not displace the district court's interpretation of § 1790b, because the district court disregarded genuine issues of material fact on Schroeder's whistleblower claims, we VACATE and REMAND for further proceedings.[1]

## I

This case arises out of Schroeder's and her employer GNOFCU's competing complaints and frustrations that eventually led to Schroeder's termination. Schroeder joined GNOFCU as a collections manager in May 2006. By July 2007, GNOFCU's CEO Janet Sanders ("Sanders") promoted her, and Schroeder's responsibilities expanded to include management over the lending department and the call center. Schroeder also received an $8,000 raise. In the next months, Schroeder apparently performed her duties to GNOFCU's satisfaction.

In December 2007 Schroeder and Sanders began to butt heads. Schroeder approached Sanders to discuss what she viewed as potential fraud in GNOFCU's lending practices. Sanders, she asserts, dismissed her concerns. But GNOFCU maintains that Sanders already had identified lending errors by a mortgage loan officer and was taking steps to correct them—including contacting the National Credit Union Administration ("NCUA") for guidance. Less than a month later, Sanders began to complain that Schroeder was not managing her three departments competently. GNOFCU immediately sent Schroeder to six training seminars on lending and management, but, according to GNOFCU, Schroeder's performance did not improve.

---

[1] Schroeder also disputes the district court's finding that she is not entitled to punitive damages on her retaliation claims. The district court merely based its finding that GNOFCU was not liable for punitive damages on Schroeder's failure to show a claim of retaliation and did not evaluate Schroeder's entitlement to punitive damages. Accordingly, we do not reach this question on appeal.

No. 10-31169

Two months later, in March 2008, Schroeder approached Ray Condon ("Condon"), a member of the GNOFCU Board of Directors ("Board") to discuss the company's possibly fraudulent lending practices. Condon advised Schroeder to discuss these potential problems with the Board. Soon after Schroeder spoke to Condon, Sanders called Schroeder into her office to discuss their conversation. The meeting was unproductive. Schroeder declined to raise any questions of fraud at GNOFCU to Sanders. Schroeder blamed her reticence on her perception that Sanders was not interested in taking steps to correct the problems Schroeder identified. Sanders's faith in Schroeder's managerial abilities continued to diminish.

A blind advertisement for a lending manager appeared in the May 18 and 25, 2008, editions of the *Times-Picayune*. GNOFCU placed the ad; it sought a limited replacement for Schroeder in the lending department. It is unclear whether Schroeder saw it. On May 30, she approached Wayne Aufrecht, chairman of GNOFCU's Supervisory Committee, to reiterate her claims of mortgage fraud at GNOFCU. Their meeting ended with Schroeder scheduling an appointment with the Supervisory Committee. But before appearing before the Supervisory Committee, Schroeder first met with Sanders and Theresa Wolff ("Wolff"), GNOFCU's Human Resources Director, on June 9, 2008. In this meeting, Sanders and Wolff stripped Schroeder of most managerial duties. In a letter written that day, Sanders accounted for Schroeder's demotion: "many of the goals we set up for your departments have yet to be accomplished"; "many [goals] have yet to be addressed at all"; "[a]n inability to prioritize, take action and manage indicates to me that you are overwhelmed and therefore not able to function as efficiently or effectively as you or I would like." The letter praised only Schroeder's work in the collections department.

Less than two weeks after her demotion, Schroeder made a series of phone calls to the NCUA and the Federal Bureau of Investigations ("FBI"). Schroeder's

phone records confirm that she made seven phone calls to the NCUA on June 19 and 20, 2008. Five lasted only about twenty seconds; the remaining two each lasted around two minutes.[2] Although Schroeder claims that an NCUA employee told her, "We're working on it," the NCUA has no record of her call. GNOFCU employees Connie Bergeron and Vanessa Sellers confirm that Schroeder boasted of plans to go to the NCUA in June 2008. Schroeder admits that she told neither Sanders nor Aufrecht, nor any other authority within GNOFCU, about these calls.

One week after calling the FBI and NCUA, Schroeder appeared before the Supervisory Committee and reprised her complaints about the mortgage department's lending practices. This time, the GNOFCU hired an internal auditor to investigate Schroeder's concerns. The internal audit only partly confirmed what Schroeder claimed: some loans Schroeder brought to the Board's attention violated GNOFCU's internal policies. The audit, however, uncovered no evidence of criminal fraud.

Two more weeks passed. On July 12, Geri Kisner, a GNOFCU employee working directly under Sanders, invited George Christian, a GNOFCU employee in Schroeder's department, to her house for dinner. As the night wore on, Christian began to complain about Schroeder's attitude as a manager. He also told Kisner that he worried that Schroeder may be acting unethically. Christian revealed that Schroeder had bragged to employees under her supervision of her plans to go to the NCUA and had made copies of confidential GNOFCU files to bolster her complaint. Within the next two days, Kisner claims that she told Sanders about this conversation. Sanders has testified, however, that she did not know Schroeder intended to complain to the NCUA until many months later.

---

[2] A phone call to the FBI lasted over twenty minutes.

No. 10-31169

Only a day or two after speaking to Kisner, Sanders sent a letter to the Supervisory Committee. The letter confirms her understanding "that the expanded audit was a result of a complaint to the Supervisory Committee by Mary Schroeder" but mentions no potential NCUA complaint. The letter emphasizes that Schroeder was "underperforming as a manager and [wa]s creating disturbances within the organization that are counterproductive and damaging morale, at a minimum"; the letter further explains that Sanders and Wolff had planned to confront Schroeder about these problems. Sanders and Wolff decided to delay any confrontation, however, until GNOFCU could secure the advice of counsel on how to "avoid the appearance of any retaliation," in light of Schroeder's role in the audit.

On August 8, about three weeks later, Sanders reduced Schroeder's salary to her pre-promotion level. In a letter, Sanders continued to insist that Schroeder was underperforming. Sanders cautioned Schroeder, "It is not . . . prudent for someone of your level in management to make negative comments that might stimulate discord about the organizational structure. This shows poor judgment on your part."

Two weeks later, Schroeder sent a letter to both the Board and the Supervisory Committee, insisting that Sanders reduced her salary because of the June 27 meeting with the Supervisory Committee:

> The purpose of this letter is to inform you of a series of events that will cause damage to [GNOFCU.] My meeting with you concerning potential mortgage fraud was in a setting of confidence leading me, the Whistle Blower, to believe I was protected.
>
> Since that June 28, 2008 meeting with the Supervisory Committee I have been accused of trying to extort money from the Credit Union, by [Sanders,]. . . . My salary has been cut by $8,000.00 per year . . . In [a counseling memo] Ms. Sanders indicates that we have discussed a number of issues that never occurred.

5

No. 10-31169

> Also, since that meeting with the Supervisory Committee, I have learned that Ms. Sanders is aware of my meeting with you and the information shared.
>
> Her motives to demote, reduce salary, and discredit me appears to be retaliatory, and her statements in the memo are total fabrication.

Schroeder's letter broadly asserted protections owed her under federal and state whistleblower statutes based on her report to the Supervisory Committee but mentioned no past, present, or future complaint to the NCUA.

In the first week of October, Schroeder and GNOFCU took a series of overlapping actions seemingly adverse to the other. First, on October 1, 2008, Schroeder's attorney sent an e-mail to the NCUA, summarizing Schroeder's reports to the Board and Supervisory Committee on fraud and also notifying the NCUA of Schroeder's intent to file a whistleblower complaint. His e-mail does not reference Schroeder's June 2008 phone calls to the NCUA. Over the next week, on the advice of its attorney, GNOFCU peppered Schroeder's file with several employee complaints regarding Schroeder's attitude and management style.

The sequence of the events that followed is disputed. What is clear is that the Board ended Schroeder's employment by letter on October 8, 2008. In firing Schroeder, the Board expressed its satisfaction that retaliation played no role; the Board believed that her termination was in "good faith on legitimate bases" and supported by "reasonable business judgment" in light of the concerns with Schroeder's conduct. Around the time of her termination, Schroeder sent complaints to the NCUA and FBI detailing what she viewed as fraudulent lending at GNOFCU. When she sent these letters is in dispute. Although she dated both letters on October 6, 2008, the NCUA did not record receipt of the letter until over two weeks later, on October 21. It is thus unclear whether Schroeder sent this letter before or after her termination.

No. 10-31169

The NCUA advised Schroeder on October 22 that it would investigate GNOFCU's lending practices. NCUA audited GNOFCU in December 2008 as a result of Schroeder's complaint. The audit confirmed fraud among mortgage applicants but found no evidence of wrongdoing among employees or management.

Schroeder sued GNOFCU, claiming retaliation under a range of federal and state statutes based on her whistleblower activities. Rejecting Schroeder's claims of retaliation in violation of 12 U.S.C. § 1790b and LA. REV. STAT. ANN. § 23:967(A), the district court granted summary judgment for GNOFCU and dismissed Schroeder's claims.[3] On appeal, Schroeder presses that the district court ignored evidence supporting both her protected activities and a causal connection between her complaints to the NCUA, FBI, and GNOFCU's Board and Supervisory Committee and her demotion, pay decrease, and termination. These facts, she asserts, should have precluded summary judgment for GNOFCU on Schroeder's § 1790b and Louisiana law whistleblower claims. Schroeder also challenges the district court's construction of § 1790b.

## II

We review a district court's grant of summary judgment *de novo*. *Am. Nat'l Gen. Ins. Co. v. Ryan*, 274 F.3d 319, 323 (5th Cir. 2001). Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In determining whether a genuine dispute of material fact remains, we view the record in the light most favorable to Schroeder. *Am. Int'l Specialty Lines Ins. Co. v. Canal Indem.* Co., 352 F.3d 254, 260 (5th Cir. 2003).

## III

12 U.S.C. § 1790b(a)(1) instructs:

---

[3] Schroeder also raised claims under 12 U.S.C. § 1831; 31 U.S.C. § 5328; and 18 U.S.C. § 1513(e), which the district court dismissed. She does not raise these claims on appeal.

No. 10-31169

> No insured credit union may discharge or otherwise discriminate against any employee with respect to compensation, terms, conditions, or privileges of employment because the employee (or any person acting pursuant to the request of the employee) provided information to the [NCUA] Board or the Attorney General regarding any possible violation of any law or regulation by the credit union or any director, officer, or employee of the credit union.

We have not yet had the opportunity to articulate the requirements of a § 1790b claim.  Drawing on our Title VII retaliation precedent, the district court required Schroeder to present evidence to support the following elements of her claim: (1) she engaged in a protected activity; (2) GNOFCU took adverse employment action against her; and (3) a causal link exists between her protected activities and GNOFCU's adverse employment action.  *Schroeder v. Greater New Orleans Fed. Credit Union*, No. 09-3647, 2010 WL 4723357, at \*7 (E.D. La. Nov. 15, 2010) (citing *McCoy v. City of Shreveport*, 492 F.3d 551, 556–57 (5th Cir. 2007)).

This framework accurately reflects § 1790b's mandates and the approach of our sister circuits.  *See Simas v. First Citizens' Fed. Credit Union*, 170 F.3d 37, 44 (1st Cir. 1999); *McNett v. Hardin Cmty. Fed. Credit Union*, 118 F. App'x 960, 964 (6th Cir. 2004).  The parties presume on appeal that it applies.  We hold that this framework applies to § 1790b claims.[4]  Schroeder's arguments on appeal target only the first and last questions of this inquiry.[5]

---

[4] Our application of Title VII precedent is limited, however.  We do not decide whether the "but for" test in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) or the "motivating factor" standard of *Smith v. Xerox Corp.*, 602 F.3d 320 (5th Cir. 2010) constrains the causation inquiry under § 1790b.

[5] Neither party disputes the district court's finding that Schroeder suffered adverse employment actions: she was demoted; her salary was decreased; and, eventually, she lost her job.  These adverse actions correspond to the actions described in § 1790b.  *See* 12 U.S.C. § 1790b(a)(1) (prohibiting retaliation by "discharg[ing] or otherwise discriminat[ing] . . . with

8

No. 10-31169

## A

In granting summary judgment for GNOFCU, the district court focused its analysis on whether Schroeder could show a causal connection between the adverse employment actions and protected activities she alleged; it concluded that the evidence could not support a causal connection between the two. Intertwined in the district court's discussion of causality is its doubt as to whether Schroeder engaged in any protected activity.

In questioning whether Schroeder participated in a protected activity, the district court noted that Sanders testified that she was not aware of any report until Schroeder served GNOFCU with her complaint; NCUA had no records of any calls from Schroeder to the fraud hotline despite its protocol to document such calls; NCUA did not initiate an investigation in response to Schroeder's alleged calls; NCUA records showed that NCUA received Schroeder's complaint on October 22, 2008; and Schroeder could not show that her letter dated October 6, 2008, was mailed before her termination date. The district court also disputed that there were witnesses who saw or heard Schroeder make a call to the NCUA hotline and, disregarding the weight of Schroeder's phone records, rejected as inadequate Schroeder's assertions that she dialed the NCUA's hotline and that the NCUA returned her call. Further, the district court stressed that GNOFCU was already taking remedial action to fix problems independent of Schroeder's alleged complaints.

The district court conclusively determined that no causal connection linked Schroeder's claimed whistleblower activities with the employment actions taken against her. Schroeder, the district court found, offered nothing beyond evidence of temporal proximity between her communications and GNOFCU's adverse actions; no other evidence supported Schroeder's contention that her claimed

---

respect to compensation, terms, conditions, or privileges of employment.").

whistleblower activities played any role in her termination. Rather, the district court found evidence of her substandard performance, poor managerial style, and conflicts with other employees including Sanders supported her termination. The district court also found that the record lacked any evidence that GNOFCU was aware of Schroeder's alleged protective activities.

**B**

Schroeder maintains that she presented evidence of her protected activities sufficient to defeat summary judgment: her June 2008 phone calls and October 2008 e-mail and letters to the NCUA and FBI. Thus, she asserts, the district court improperly disregarded this evidence in finding that Schroeder did not sustain her burden in opposing summary judgment. She also urges this court to extend § 1790b's protections to her wholly internal complaints to the Board, Supervisory Committee, and their individual members. Schroeder further challenges the district court's finding of no causal connection, stressing that there was little evidence of disciplinary problems in her record; that GNOFCU did not pursue any clear policy in demoting or terminating her; and that the temporal link is strong between her treatment at work and her complaints on fraud. Schroeder further emphasizes that she presented the district court with evidence showing that GNOFCU employees knew of her whistleblower actions. Schroeder therefore asserts that the district court's conclusion that GNOFCU lacked knowledge of her protected activities flouts the record and draws the wrong inference from GNOFCU's assertions that it had already taken action to correct the problems of which Schroeder complained.

GNOFCU supports the district court's conclusion that Schroeder did not present evidence that she engaged in a protected activity before her termination. GNOFCU presses that Schroeder's phone records are insufficient to preclude summary judgment; corroboration by the NCUA's records—not present here—is vital to survive summary judgment. GNOFCU further challenges Schroeder's

October 6, 2008, letter as failing to satisfy evidence that she engaged in a protected activity because NCUA had no record of its receipt until later in October, weeks after her termination. Because NCUA lacks any records of Schroeder's letter until after her termination, GNOFCU maintains that summary judgment was proper. GNOFCU further emphasizes the district court's holding that Schroeder presented no evidence showing that anyone at GNOFCU had knowledge of her protected activity and maintains that the district court properly found no causal connection between Schroeder's claimed complaints and GNOFCU's adverse actions. Nothing beyond temporal proximity supports this causality, and this, GNOFCU asserts, is insufficient to thwart summary judgment.

## C

### 1

Before we address whether the district court ignored genuine issues of material fact in granting summary judgment for GNOFCU, we address a legal question Schroeder raises on appeal. Schroeder disputes the district court's narrow construction of § 1790b and claims that her reports to Sanders, the Board, the Supervisory Committee, and the FBI may support her claim. Brushing aside the statute's articulated limits, Schroeder stresses that Congress intended to ensure the free flow of information regarding fraud and other improper behavior within the various financial institutions. GNOFCU maintains that the plain language of the statute supports the narrow construction adopted by the district court.

The statute narrowly prohibits retaliation based on the report of a possible legal violation to either the NCUA Board or the U.S. Attorney General. *See* 12 U.S.C. § 1790b; *see also Bruns v. Nat'l Credit Union Admin.*, 122 F.3d 1251, 1254-55 (9th Cir. 1997) (affirming the dismissal of § 1790b claim because the plaintiff "does not allege that he provided any information to the NCUA or to the

No. 10-31169

Attorney General"); *Ridenour v. Andrews Fed. Credit Union*, 897 F.2d 715, 721 n. 5 (4th Cir. 1990) (noting that a litigant fails to state a claim when he does not allege a report of possible violations to the Board or the Attorney General); *Stephan v. GNOFCU*, No. 09-3712, 2009 WL 3837642, at *3 (E.D. La. Nov. 16, 2009) (This strict interpretation is "supported by the decisions of all the courts that have faced this question."). Because we enforce plain and unambiguous statutory language so long as it does not yield absurd results, *Dunn v. Commodity Futures Trading Comm'n*, 519 U.S. 465, 480 (1997); *see Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) ("The plainness . . . of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole."), we agree that Schroeder's internal complaints are not relevant to this § 1790b appeal.[6] The statutory text leaves us no ambiguity to resolve in this appeal.

**2**

In addressing whether Schroeder engaged in protected activity that would support her § 1790b claim, we focus on two sets of communications Schroeder claims she made to the NCUA: (1) her June 2008 phone calls and (2) her attorney's October 2008 e-mail and her October 2008 letter. We next address whether evidence supports these complaints sufficient to foreclose summary judgment. While some evidence supports the district court's and GNOFCU's suspicion that Schroeder sent the letter only after her termination, other evidence supports Schroeder's version of events. For example, phone records

---

[6] This holding extends only to Schroeder's internal complaints. We decline to answer whether § 1790b encompasses Schroeder's complaints to the FBI. *See* 12 U.S.C. § 1790b (limiting liability to information provided "to the [NCUA] Board or the Attorney General"). Because Schroeder's communications to the FBI were contemporaneous with those to the NCUA, and because we are able to resolve the issues presented on appeal based on Schroeder's NCUA communications alone, we need not decide now whether § 1790b extends its protections to a whistleblower complaints directed toward the FBI, a federal agency falling under the authority of the Attorney General.

show that Schroeder called the NCUA seven times in June 2008; two of those calls were long enough to reflect that she may have spoken to someone or left a message. And several co-workers testified that they were aware that she intended to go to the NCUA in June 2008. Clear proof of her October 2008 communications with the NCUA lies in copies of her attorney's October 1 e-mail and her October 8 letter. Further, it cannot be disputed that Schroeder's attorney sent an e-mail on her behalf to the NCUA before her termination. Taking the facts in a light most favorable to Schroeder, we find that the evidence and testimony presented could have allowed a reasonable jury to find that Schroeder had engaged in a protected activity in both June and October 2008. The district court therefore erred in concluding otherwise.

Next, we must consider the causal link between these protected activities and Schroeder's demotion, pay decrease, and termination. In evaluating the claimed causal connection, we may look to (1) Schroeder's past disciplinary record, (2) whether GNOFCU followed a policy in penalizing Schroeder, and (3) the temporal proximity between Schroeder's protected activity and GNOFCU's adverse actions. *See, e.g.*, *DeHart v. Baker Hughes Oilfield Operations, Inc.*, 214 F. App'x 437, 442 (5th Cir. 2007) (citing *Nowlin v. Resolution Trust Corp.*, 33 F.3d 498, 508 (5th Cir. 1994)); *see also Smith v. Xerox Corp.*, 371 F. App'x 514, 520 (5th Cir. 2010) (noting that existence of a causal link is highly fact specific and recounting same three factors). These factors reveal evidence tending to support a causal connection here.

First, Schroeder's past disciplinary record reveals a mixture of favorable and unfavorable facts and weighs neutrally on summary judgment. She was promoted soon after she was hired, possibly reflecting come confidence in Schroeder's abilities in her first year on the job. Her disciplinary record lacks any recorded complaints until the week of her termination. Even in demoting her, GNOFCU praised Schroeder's performance in collections. But Schroeder

was sent to remedial training seminars.  Employees and management alike complained of Schroeder's abrasive manner.

Next, that GNOFCU followed no policy in demoting or terminating Schroeder, cutting her pay, and receiving her complaints cuts in Schroeder's favor—particularly when considering that part of her poor reputation at work came from her persistence in repeatedly seeking help at all management levels with what she perceived to be fraud.  *See Smith*, 371 F. App'x at 520 (finding causal link where terminated employee "was a long-tenured employee with no disciplinary history prior to 2005 who was subjected not only to termination shortly following the EEOC complaint but also to suspicious new charges of wrongdoing for arguably minor incidents following that complaint."); *see also Dehart*, 214 F. App'x at 442 (finding causal connection not satisfied where there was strong evidence that employer followed detailed policy in disciplining an employee, gave her several warnings to correct her missteps, and repeatedly accommodated her complaints).

Last, turning to the question of temporal proximity, although "the mere fact that some adverse action is taken after an employee engages in some protected activity will not always be enough for a prima facie case," *Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 655 (5th Cir. 2004), close timing between the protected activity and adverse employment action may provide evidence of a causal link.  *See Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1188 (5th Cir. 1997); *see also Russell v. Univ. of Tex. of Permian Basin*, 234 F. App'x 195, 206 (5th Cir. 2007) (finding that in the absence of other evidence of discrimination, delay of six months between protected activity and adverse employment action insufficient to show causation).

The factor of temporal proximity supports Schroeder's claim only to the extent that it rests on her pay decrease and termination.  No temporal link connects Schroeder's demotion to her NCUA complaints because her demotion

preceded her first complaint to the NCUA by about two weeks. In contrast, the timing between Schroeder's pay decrease and her June 2008 phone calls to the NCUA is close; Schroeder's pay decrease came on the heels of these calls. The timing between Schroeder's termination and her October e-mail and letter also supports a finding of causation. A jury could conclude that Schroeder's termination followed her October complaints to the NCUA by no more than a week. *See LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 390 (5th Cir. 2007) (delay of two weeks between report of sexual harassment and suspension suggested a causal connection sufficient to defeat summary judgment). Further strengthening the temporal link is evidence that suggests knowledge on the part of GNOFCU; Kisner testified that she told Sanders of Schroeder's planned NCUA complaint as early as mid-July.

Ultimately we can draw competing inferences from the factors above and the adverse actions taken against Schroeder. Did Sanders push for Schroeder's demotion, pay decrease, and termination as retaliation for her complaints to the NCUA, or did Schroeder complain to the NCUA in reaction to her increasing disfavor within the organization? A jury could draw either inference; which inference it will draw, and how it will answer questions on knowledge, are for the jury to decide. *See Canal Indem. Co.*, 352 F.3d at 260 (We must "view[] the evidence in the light most favorable to the nonmoving party."). To the extent that the district court found Schroeder had not presented a genuine factual dispute as to the elements of Schroeder's prima facie claim of retaliation under § 1790b, we disagree.[7]

---

[7] The district court further found that under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), Schroeder could not show that the reasons offered for her termination—Schroeder's attitude and performance—were pretextual. The district court alternatively found that under *Smith v. Xerox Corp.*, 602 F.3d 320 (5th Cir. 2010), Schroeder had not shown that her protected activities were a motivating factor in her termination. But because the district court firmly rejected that Schroeder had shown a protected activity, that court's resolution of the inquiries under *McDonnell* and *Smith* rested on a shaky

No. 10-31169

## IV

LA REV. STAT. ANN. § 23:967(A) provides that

> An employer shall not take reprisal against an employee who in good faith, and after advising the employer of the violation of law:
> (1) Discloses or threatens to disclose a workplace act or practice that is in violation of state law.
> (2) Provides information to or testifies before any public body conducting an investigation, hearing, or inquiry into any violation of law.
> (3) Objects to or refuses to participate in an employment act or practice that is in violation of law.

In granting summary judgment for GNOFCU on this claim, the district court focused on the lack of causality between any possible protected activities and the adverse employment actions taken against Schroeder and merely reiterated its finding on Schroeder's federal claim. Because we have found that the district court minimized key evidence in finding no causal link between Schroeder's termination, demotion, and pay decrease, and her NCUA complaints, and because § 23:967 seems to offer broader protections that its federal counterpart, we find that the district court's grant of summary judgment was improper.

## V

For the reasons above, we VACATE the district court's order granting summary judgment for GNOFCU, and REMAND for further proceedings consistent with this opinion.

---

foundation—that Schroeder had not shown a prima facie case of retaliation at all. Based on our reversal in which we find that the district court disregarded key facts supporting the prima facie elements of Schroeder's retaliation claim, we believe that the separate inquiries under *McDonnell* and *Smith* are more properly addressed by the district court on remand than by us now.

16